# In the United States Court of Federal Claims

No. 11-453C

(Filed: October 16, 2013)

*******************************************
*
SUFI NETWORK SERVICES, INC.,        *
                                              *
                  Plaintiff,      *  Recovery of Attorneys' Fees,
                                *  Expenses, and Interest; Lodestar
v.                                *  Method; Attorneys' Reasonable
                                *  Rates and Hours Expended;
THE UNITED STATES,          *  Overhead and Profit.
                                *
                  Defendant.    *
                                *
*******************************************

*Frederick W. Claybrook, Jr.*, with whom was *Brian T. McLaughlin*, Crowell & Moring LLP, Washington, D.C., for Plaintiff.

*Douglas T. Hoffman*, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Steven J. Gillingham*, Assistant Director, and *Jessica R. Toplin*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

       In this breach of contract case, the Court must now determine the proper amount owed to Plaintiff, SUFI Network Services, Inc. ("SUFI"), for attorneys' fees, expenses, and interest. The origins of this case lie in an April 26, 1996 contract between SUFI and the U.S. Air Force Nonappropriated Funds Purchasing Office ("AFNAFPO," or "Air Force") to provide telephone services on Air Force bases in Germany. SUFI Network Servs., Inc. v. United States, 102 Fed. Cl. 656, 658 (2012) ("SUFI CFC I").[1] SUFI first

---

[1] The previous opinions in this case, No. 11-453C, and its related case, No. 11–804C, are referred to, in chronological order, as "SUFI CFC I" through "SUFI CFC III." Likewise, the eleven reported decisions of the ASBCA are referred to as "SUFI ASBCA I" through "SUFI ASBCA XI." See SUFI Network Servs., Inc. v. United States, 105 Fed. Cl. 184, 188 n.1 (2012) ("SUFI CFC II").

litigated its underlying contract claims before the Armed Services Board of Contract Appeals ("ASBCA"), which found that the AFNAFPO had materially breached the contract. SUFI CFC I, 102 Fed. Cl. at 656. SUFI then filed a claim for attorneys' fees and expenses, but the contracting officer failed to issue a final decision within a reasonable time, and SUFI brought suit directly in this Court. Id. at 659-60.

In a prior opinion, the Court granted summary judgment in SUFI's favor as to the Government's liability for attorneys' fees and expenses, leaving only the issue of damages to be resolved. SUFI CFC II, 105 Fed. Cl. 184, 195 (2012). The Court conducted a trial on damages on April 24-26, 2013 in Washington, D.C. The parties subsequently filed post-trial briefs and response briefs, and the Court heard closing arguments on August 28, 2013. For the reasons explained below, the Court awards SUFI all of its claimed attorneys' fees and expenses, plus interest, but denies the claim for overhead and profit.

<u>Background</u>

This case is one of many proceedings arising from a troubled contract to provide telecommunications services during "the dramatically changing telecommunications environment that existed" in the mid-1990s. SUFI CFC III, 108 Fed. Cl. 287, 294-96 (2012). On April 26, 1996, SUFI and the U.S. Air Force entered into a task order contract for the installation and operation of telephone systems for lodging facilities at Air Force bases in Germany. SUFI CFC I, 102 Fed. Cl. at 658. On August 17, 2004, after a series of disputes, the ASBCA entered a judgment declaring that the Air Force had breached the contract, and, consequently, entitling SUFI to stop performance and cancel the contract. See SUFI ASBCA II, ASBCA No. 54503, 04-2 BCA ¶ 32714 (Aug. 17, 2004). The period beginning immediately after that judgment is the period most relevant to this opinion. During that time, SUFI retained the law firm of Crowell & Moring to perform the work that generated the fees and expenses currently at issue.

Two of Crowell & Moring's tasks began immediately after the ASBCA's August 17, 2004 decision. First, SUFI began preparing monetary claims for submission to, and negotiation with, the contracting officer. Claybrook, Tr. 112. Frederick W. Claybrook, Jr., a partner at Crowell & Moring specializing in government contracts claims, took the lead and was assisted by other Crowell & Moring personnel, including his associate, Richard Zimmer, and various legal assistants. PX 1 (Attach. A ¶¶ 4-5, 10); Claybrook, Tr. 126-28, 168. Because of the complexity of the claims, Mr. Claybrook suggested that SUFI retain an accounting consultant for assistance in calculating damages. Claybrook, Tr. 143. Mr. Claybrook estimated that the cost of retaining a damages expert would be approximately $1,000,000. Claybrook, Tr. 144. SUFI decided that it could not afford such an expense. Myers, Tr. 42-43. As a result, Crowell & Moring, led by Mr. Claybrook, prepared all of the damages claims. Id. In addition, because SUFI had lost its revenue stream from the contract, it could no longer afford to retain Crowell & Moring

on a regular fee basis, and instead negotiated a contingency fee arrangement.  Myers, Tr. 42-43.  Despite these obstacles, Crowell & Moring's efforts bore first fruit on July 1, 2005, when SUFI submitted 28 individual claims to the contracting officer.  Id.; see also PX 62 (SUFI's claims narrative).

The second task involved the process of canceling the contract.  On August 25, 2004, one week after the ASBCA's decision, SUFI transmitted a letter to the Air Force canceling the contract.  PX 59 at 1.  However, understanding that an immediate cessation of services would inconvenience the guests at the lodging facilities, SUFI stated that it would continue performance while negotiating a transition period to the Air Force's operation of the telephone systems.  Id.; PX 60.  Once again, Mr. Claybrook led this effort, which culminated in an April 1, 2005 Partial Settlement Agreement ("PSA") between SUFI and the Air Force.  PX 61.  Under the PSA, SUFI agreed to sell its network to the Air Force for $1,200,000 and to receive $1,075,000 for its good will.  Id. at 1.  In return, SUFI continued to operate the network until May 31, 2005.  SUFI CFC III, 108 Fed. Cl. at 295.  On June 1, 2005, the Air Force took ownership and began operation of the telephone system at each base.  Id.   Crowell & Moring also negotiated consulting agreements for SUFI employees to continue working on the systems at the Air Force bases.  Claybrook, Tr. 286.

In September 2005, two months after SUFI submitted its claims to the contracting officer, the Defense Contract Audit Agency ("DCAA") began to audit the claims.  See PX 63.  In response, Mr. Claybrook and Stephen Myers, Jr., the Managing Director of SUFI, first met with two DCAA auditors in late September 2005.  PX 63.  The audit continued until April 2006, and during that time, Mr. Claybrook and Crowell & Moring engaged in extensive discussions with the DCAA.  PX 64; Claybrook, Tr. 134-36.

Finally, from October 12, 2006, through January 5, 2007, the parties attempted to settle the underlying claims.  Pl.'s Post-Trial Br. (July 15, 2013), at 22 ("Pl.'s Br.").  Although they reached a tentative agreement on ten claims, that agreement ultimately failed to produce a binding document signed by the contracting officer.  SUFI CFC III, 108 Fed. Cl. at 301-03.

Eventually, in a series of decisions issued between November 21, 2008, and April 5, 2010, the ASBCA ruled in SUFI's favor on 22 of its 28 monetary claims.  SUFI CFC I, 102 Fed. Cl. at 659.  Then, on December 29, 2010, SUFI filed a claim with the contracting officer for its attorneys' fees and expenses.  Id. at 659.  More than six months passed without a response from the contracting officer.  Id.  Instead, on July 7, 2011, Air Force counsel emailed SUFI that "it could consider the claim deemed denied in its entirety."  Id. at 659-60.  On July 8, 2011, SUFI filed the present action.

The Court has already granted summary judgment in SUFI's favor on the issue of liability for attorneys' fees and expenses.  SUFI CFC II, 105 Fed. Cl. at 195.  Thus, the

only remaining question is the amount of those damages.  SUFI argues that it should recover $904,188.70, exclusive of interest.  In contrast, the Government argues that portions of SUFI's claim for attorney fees, and its entire claim for interest, should be dismissed outright.  However, even if they are not dismissed, the Government submits that SUFI should recover no more than $256,543.74, exclusive of interest.  For the reasons below, the Court agrees largely with SUFI's position, except that SUFI cannot recover overhead and profit.

Analysis

A. <u>Affirmative Defenses</u>

In its post-trial brief, the Government raises two new arguments against SUFI's recovery.  First, the Government moves to dismiss a "significant portion of SUFI's claimed fees" because SUFI failed to exhaust its administrative remedies as required by the PSA.  Def.'s Post Trial Br. (July 15, 2013), at 54 ("Def.'s Br.").  Second, the Government argues that under the terms of the PSA, SUFI released its claim for fees regarding the transition and shutdown work.  <u>Id.</u> at 56-58.  As will be shown, both of these arguments are untimely and therefore cannot succeed.

Each argument constitutes an affirmative defense.  <u>See</u> <u>Jones v. Bock</u>, 549 U.S. 199, 212 (2007) (stating that exhaustion is generally regarded as an affirmative defense); RCFC 8(c)(1) (listing release as an affirmative defense).  Ordinarily, these defenses are waived if not raised by motion or answer.  <u>Kontrick v. Ryan</u>, 540 U.S. 443, 459 (2004).  The rationale behind such waiver is strengthened where, as here, the defenses are raised for the first time after trial, as this delay "prejudice[s] both the plaintiffs and the adjudicatory process."  <u>Nager Elec. Co. v. U. S.</u>, 396 F.2d 977, 982 (Ct. Cl. 1968) (concluding that a defendant, by its conduct, can waive its rights under a contractual disputes clause).

Furthermore, even if timely, both arguments would fail on the merits.  The Court has already considered and rejected the exhaustion defense, noting that SUFI's administrative exhaustion requirements were excused by the contracting officer's failure "to issue a final decision within a reasonable timeframe."  <u>SUFI CFC I</u>, 102 Fed. Cl. at 661.  The release defense also is meritless.  Although the PSA provides that SUFI may not seek further payments from the Air Force "with respect to the sale of the SUFI system," it also states that SUFI "does not waive any rights it may have to collect all damages otherwise available" for breach of contract.  PX 61 at 3 (¶ 5).  Consequently, both affirmative defenses must fail.

B. Attorneys' Fees

Previously, the Court held that SUFI is entitled to its attorneys' fees and expenses as the direct and foreseeable result "of the Government's 'breach of its contractual undertakings.'" SUFI CFC II, 105 Fed. Cl. at 195 (quoting Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir. 1997)). The Court further explained that the proper measure of attorneys' fees is the "lodestar" method, which multiplies the number of reasonable hours by a reasonable hourly rate. Id. at 191. Thus, the issue at trial was the proper number of hours and the appropriate rate.

1. The Hours Worked are Reasonable.

A party seeking attorneys' fees must document and submit evidence of the number of hours worked. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). Counsel are "not required to record in great detail how each minute of his time was expended," but should at least "identify the general subject matter of [the] time expenditures." Id. at 437 n.12. A basic principle guiding the determination of reasonableness is that "[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary*." Id. at 434 (emphases in original). Accordingly, the party seeking an award of fees is not entitled to recover fees for "hours that are excessive, redundant, or otherwise unnecessary." Id.

SUFI divides the claimed hours, from August 27, 2004 through July 1, 2005, into three categories: (1) claim preparation and transition activities; (2) responding to inquiries from the contracting officer and the DCAA; and (3) settlement efforts. Pl.'s Br. at 21-22. The Government does not dispute the number of hours assigned to the third category. Def.'s Br. at 70. However, the Government does object to the claim as it relates to the first two categories on the grounds that it "is vague, fails to allocate time between different tasks, contains unreasonably large minimum time increments, lacks billing judgment, and does not demonstrate proper allocation of work among staff." Id. at 58. Therefore, the Government argues, the Court should apply, "at a minimum, a 20 percent proportionate redistribution of Mr. Claybrook's hours and a 30 percent across-the-board reduction." Id. None of these objections is persuasive.

The Government's arguments, as well as the authorities cited in support of them, can be reduced to the simple proposition that a court must make a determination of what is reasonable. See, e.g., Heller v. D.C., 832 F. Supp. 2d 32, 49 (D.D.C. 2011) (stating that a fee application must have sufficient detail to show the reasonableness of the claimed hours). While the cases cited in the Government's brief resulted in reductions to the claimed fees, they did so only because the original requests were, for a variety of reasons, deemed unreasonable. However, the specific circumstances of those cases do not exist here. See, e.g., Eureka Inv. Corp. v. Chi. Title Ins. Co., 743 F.2d 932, 941 (D.C. Cir. 1984) ("Time recordkeeping must be relatively detailed in [actions involving fee-shifting statutes] for several reasons *not applicable to private damages actions*."

(emphasis added)).   On the contrary, if anything, the hours requested in this case represent a conservative figure.

At trial, SUFI presented evidence that Crowell & Moring, consistent with its usual billing practice, tracked the number of hours worked on a daily basis and consolidated those entries in an electronic billing system.  Rynberk, Tr. 84, 86; Claybrook, Tr. 165-66; see also PX 8 (copies of timesheets).  According to the assigned charge number, these hours were all associated with the SUFI matter and, more specifically, with the Air Force's material breach.  Claybrook, Tr. 165-67, 171-72; PX 8.  Additionally, in March 2006, Mr. Claybrook prepared a chart that allocated non-litigation, claim preparation hours to specific claims, excluding hours allocated to the claims denied by the ASBCA. Claybrook, Tr. 167, 171, 176; PX 1 (Attach. A ¶ 6); PX 2; PX 64.

SUFI has met its burden by providing evidence of its claimed hours, and there is nothing in the record to persuade the Court that these hours are "excessive, redundant, or otherwise unnecessary."  The claims presented by SUFI were large and complex, totaling over $130,000,000, and involved complicated methods of calculating damages.  See generally SUFI CFC III, 108 Fed. Cl. at 295.  Moreover, in a case such as this, where the law firm is working on a contingency basis and has no guarantee that it will recover its costs, there is ample motivation for the firm to maximize both its efficiency and the likelihood of success.  Given these circumstances, it is not unusual that Mr. Claybrook, an experienced attorney in the field of government contracts, elected to perform much of the work himself.  Accordingly, the Court is satisfied that the contemporaneous time sheets prepared by Crowell & Moring accurately reflect the work done, and the contingency nature of the hours worked provided sufficient incentive for Crowell & Moring to exercise proper billing judgment.

## 2.   The Rates Charged are Reasonable.

The other multiplier in the lodestar equation is the reasonable hourly rate.  The fee applicant bears the burden of producing satisfactory evidence that its requested rates are reasonable.  Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984).  As long as the requested rates are "in line with those prevailing in the community," they are presumptively reasonable.  Id.  The prevailing market rate is "defined as the rate 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"  Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008) (quoting Blum, 465 U.S. at 896 n.11).

First, SUFI presented testimony as to the rates typically charged and collected by Crowell & Moring during the relevant time period.  Claybrook, Tr. 142-43.  SUFI then presented substantial evidence supporting the reasonableness of those rates.   For example, SUFI offered an expert report by Mr. Peter Garvin, an experienced practitioner in government contracts and partner in the Washington, D.C. office of Jones Day.  After

reviewing the billing rates charged by Crowell & Moring and comparing them with those charged by Jones Day during the same time period, Mr. Garvin concluded that they were comparable.  PX 57 at 2.  He further stated that "Crowell & Moring is one of the best known law firms in the field of government contracts [and] consistently receives the highest ratings from peers and rating organizations."  PX 57 at 9 (¶ 3).  SUFI also offered evidence of the substantial experience, education, and credentials of Mr. Claybrook and his associates.  See Claybrook, Tr. 104-07; PX 48-53 (résumés of Mr. Claybrook, his associates, and paralegals).  Finally, SUFI presented evidence of the market conditions in the Washington, D.C. area, both through Mr. Claybrook's testimony and through private media surveys, such as those conducted by *The National Law Journal*, *Chambers USA*, and *Of Counsel*.  See Claybrook, Tr. 197-205; see also PX 26-27, 29-37, PX 41 (charts summarizing numbers from private media surveys).  This evidence, viewed as a whole, amply demonstrates that the claimed rates are presumptively reasonable.

The Government's response does not challenge this presumption.  Rather, the Government contends that instead of using Crowell & Moring's rates, the fee calculation should be based on the "Laffey Matrix."  See Def.'s Br. at 80-82 (citing Laffey v. Nw. Airlines, Inc., 746 F.2d 4 (D.C. Cir. 1984), *overruled in part by* Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516 (D.C. Cir. 1988)).  This contention misses the mark.  Ultimately, the issue is not the validity of the Laffey Matrix, but whether the Government can rebut the presumption of reasonableness that attaches to Crowell & Moring's billing rates.  Simply put, SUFI has presented evidence that the charged rates are reasonable, and the Government has failed to present evidence to the contrary.

Therefore, based on the Court's determination that Crowell & Moring's rates and hours worked were reasonable, the Court awards SUFI $697,702.50 in fees.

3.  SUFI May Recover All of Its Claimed Expenses.

SUFI claims $25,486.81 in expenses.[2]  The Government and SUFI have stipulated that $15,527.04 of those expenses is recoverable.  Pl.'s Br. at 38; Def.'s Br. at 50.  The balance of $9,959.77 remains in dispute.

The Government's basic contention is that SUFI cannot prove all of the expenses were reasonably incurred.  Specifically, the Government argues that computer library research costs, long-distance telephone charges, facsimile and postage charges, and some travel expenses were insufficiently documented.  Def.'s Br. at 93.  Consequently, the Government argues, it cannot be determined whether those costs were reasonable, and the claims for those expenses must be rejected.  Id. at 95.

---

[2] SUFI originally claimed $25,648.46, but later acknowledged a calculation error of $161.65 and reduced its claim by that amount.  Pl.'s Br. at 3 n.2.

However, the testimony at trial was that Crowell & Moring followed its usual billing practice for these expenses, and clients, including SUFI, regularly accept them as adequate.  Rynberk, Tr. 87-88, 90, 92-95; Myers, Tr. 46; PX 23; PX 24.  Regarding the computer library research, long-distance telephone, and facsimile and postage charges, Crowell & Moring demonstrated that each event required an attorney to enter the charge number for the specific client, then to itemize the expense on firm billing records. Regarding the travel charges, Crowell & Moring provided, among other evidence, receipts from the same period for the same types of costs.  PX 4; Myers, Tr. 49-61; Claybrook, Tr. 158-62.

"As with attorney's fees, the court will not second-guess counsel's decision to incur expenses it thought necessary to properly present its case."  Florida Rock Indus., Inc. v. United States, 9 Cl. Ct. 285, 291 (1985).  In this case, the Court is satisfied by the evidence presented that the claimed expenses were reasonably incurred and properly valued.  Accordingly, the Court awards SUFI $25,486.81 in expenses.

    4.  Interest is Recoverable Under the PSA from the Date the Work was Performed.

SUFI claims interest on its award under the PSA, which provides in relevant part:

> The Air Force agrees to the following concerning any claims filed by SUFI with the AF concerning the Contract and this Agreement:
>
> (a) The Air Force will be liable to pay interest on any amounts paid or recovered by settlement or judgment from the earlier of (i) the date of receipt of the claim or (ii) the date damages are actually incurred, until payment.

PX 61 § 4.  Neither the validity of this section nor the applicability of the Federal Reserve Board's prime rate is at issue.  SUFI CFC III, 108 Fed. Cl. at 301 (citing SUFI ASBCA VIII, ASBCA No. 55306, 09-1 BCA ¶ 34018 (Nov. 21, 2008)).  Rather, the parties' dispute is over which of the two dates specified in the PSA triggered the accrual of interest.

The Government argues that SUFI's contingency fee arrangement means that the charges were not actually incurred at the date the services were performed.  Def.'s Br. at 89-90.  Thus, the Government posits, the earliest date of accrual would be December 29, 2010, when SUFI submitted its claims for fees and expenses to the contracting officer.  Id.  In support of this argument, the Government cites only one authority, see id. at 90 (citing Bluebonnet Savings Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003)), but Bluebonnet stands only for the unremarkable proposition that "the non-breaching party should not be placed in a better position through the award of damages

than if there had been no breach," 339 F.3d at 1345.  Though true as a general principle, that statement offers no assistance in determining which date is correct under these specific circumstances.

A more helpful rule is that fees are incurred either when they are paid or when "there is an 'express or implied agreement that the fee award will be paid over to the legal representative.'"  United Partition Sys., Inc. v. United States, 95 Fed. Cl. 42, 53 (2010) (quoting Phillips v. Gen. Servs. Admin., 924 F.2d 1577, 1583 (Fed. Cir. 1991) (per curiam)).  Following that rule, there can be no dispute that SUFI is entitled to interest from the date damage was actually incurred.

5.  <u>SUFI is Not Entitled to an Overhead and Profit Multiplier.</u>

As a final matter, SUFI seeks a 25 percent "combined overhead and profit rate . . . to be applied to its attorneys' fees and expenses."  Pl.'s Br. at 41.  SUFI does not, however, provide adequate justification for this claim.

Although the Federal Acquisition Regulation ("FAR") does not control in this instance, it does offer useful guidance.  SUFI CFC II, 105 Fed. Cl. at 188 & n.2.  Here, the relevant guidance is that awards of overhead and profit are premised on the contractor, through its subcontract management functions, providing some benefit to the Government.  See FAR 52.215-23 (stating that the Government shall not pay for indirect costs or profits on work performed by a subcontractor where the contractor "adds no or negligible value to a contract").

In this case, the Court agrees with the Government that Crowell & Moring "was running the show."  Def.'s Br. at 88.  This is understandable, because, unlike SUFI, whose contract with the Air Force was its first government contract, Myers, Tr. 38, Mr. Claybrook has been practicing government contracts law for "the dominant part" of his career, Claybrook, Tr. 107, and is highly regarded in this field, PX 57 at 9 (¶ 3).  Indeed, although Mr. Myers testified that that he "worked closely" with Mr. Claybrook, communicating with him by email, by telephone, and in person, Myers, Tr. 38-39, there is nothing in the record indicating that SUFI added anything more than negligible value to Mr. Claybrook's work.  In fact, just a few days before SUFI filed its claims, Mr. Claybrook went to SUFI's corporate office in New Jersey with "all the claims and walked through them with [Mr. Myers] and Mr. Pearson."  Myers, Tr. 42.  Mr. Myers testified that he thought Crowell & Moring "did a great job . . . organizing [the claims] and putting them together."  Myers, Tr. 42.  The Court agrees with this sentiment, but does not agree with SUFI that it added any material value to this work.  Accordingly, SUFI is not entitled to overhead or profit.

Conclusion

For the reasons set forth above, the Court awards SUFI all of its claimed attorneys' fees and expenses, with interest calculated at the Federal Reserve Board's prime rate. The Court concludes, however, that SUFI has failed to establish its entitlement to a 25 percent profit and overhead rate.

In sum, the Court awards SUFI damages in the amount of $697,702.50 in attorneys' fees and $25,486.81 in expenses, for a total of $723,189.31, plus cumulative interest at the Federal Reserve Board's prime rate, see PX 1 Ex. 7, until payment.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge